# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:15 CR 525 RLW / DDN |
| ) | |
| DARIUS ROSE, ) | |
| ) | |
| Defendant. ) | |

## ORDER AND RECOMMENDATION

On March 2, 2016, this action came before the court for an evidentiary hearing on the pretrial motions of the parties, which were referred to the undersigned Magistrate Judge under 28 U.S.C. § 636(b). Pending are the motions of defendant Darius Rose to suppress (Docs. 30 oral, 50) and the motion of the United States for a determination by the court of the admissibility of any arguably suppressible evidence (Doc. 31 oral).

From the evidence adduced during the evidentiary suppression hearing, and considering the memoranda of the parties, the undersigned makes the following findings of fact and conclusions of law:

## FACTS

1. During September 2015 Special Agent David Herr, Federal Bureau of Investigation, and other agents began the investigation of a case involving the kidnapping of Ryan Hicks. Agent Herr is the case agent for the investigation.[1] Hicks, a resident of San Diego, California, was also known as Monk Molano and was then involved in trafficking marijuana in the St. Louis, Missouri area with co-defendant Ortega Mitchell who lived in the St. Louis area.

---

[1] Special Agent Herr was the only witness to testify at the hearing. Besides recounting the government's investigation of the case, he testified to information learned from interviewing Ryan Hicks.

2. On September 25, 2015, Hicks flew from San Diego to St. Louis Lambert International Airport at the suggestion of Ortega Mitchell, so that Hicks could pick up money. This money would be used to buy marijuana in California. This marijuana would be shipped to St. Louis for distribution. After landing, Hicks was picked up by Ortega Mitchell and two individuals also involved in the drug trafficking. They drove Hicks to a house in Illinois.

3. Upon arriving at the house, all three went inside where a fourth person (P4) was present. P4 was wearing a ski mask.[2] The ski mask holes for P4's eyes and nose were sufficiently larger than his eyes and nose for Hicks to discern some identifying characteristics of P4. Also, Hicks saw that P4 was then armed with an AK-47 automatic rifle. P4 ordered Hicks to lie on the floor, which he did. Then Hicks's cash and cell phone were taken from him.

4. Next, Hicks was put in a bedroom of the house and kept there for two days. During those two days, P4 occasionally told Hicks that he was leaving to make phone calls to Hicks's wife and to demand ransom money from her. Also during these two days, P4 laughingly showed Hicks his weapon and its ammunition. At one point, P4 told Hicks that they were going to bury Hicks in eight feet of concrete.

5. On September 29, 2015, Hicks was put into the back seat of a vehicle by P4 whom Hicks could see was armed with a gun equipped with a silencer. P4 drove Hicks to another house where he was placed in the basement. On several occasions, P4 told Hicks he was leaving this house to make more ransom phone calls.

6. On September 30, 2015 P4 and the other captors drove Hicks to the area of Hampton and Columbia streets in the City of St. Louis. There he was released.

7. Each time Hicks was moved, his shirt was pulled up over his face; nevertheless he could see through the shirt to some extent. Also, in each move P4 drove the vehicle.

---

[2] From the evidence adduced during the suppression hearing, because there was no evidence to the contrary, the undersigned infers that each time victim Hicks was P4, P4 wore this ski mask.

8.      After his release from the captors' vehicle, Hicks walked to a nearby gas station where he phoned his father.  Later, members of the Federal Bureau of Investigation picked him up and took him to the FBI office in St. Louis.

9,      There the agents interviewed Hicks.  Hicks told them about his captivity. He told the agents that there were times when he was able to look P4 in the face from an arm's length away.  Hicks told the agents he concentrated on P4 because he was armed and was the primary person who threatened him.

10.     During the interview on September 30, 2015, the FBI agents told Hicks that they would show him a series of 6 photographs, that people involved in his case may or may not be in the photos, and that the agents would lay the photos out in front of him. The agents laid six pages of photos (Gov. Ex. A) on the table in front of him, one photo per page.[3]

11.     The six photographs were in color and were the faces of African American men.  Each photo filled half of an 8.5 X 11 inch piece of paper, in landscape position. Each of the six men appeared to be approximately the same age and build.  Each had reasonably similar facial hair on the upper lip and chin.  None wore eyeglasses.  The skin tone of five of the six was darker than subject 3.  The only characteristic of subject #2 that stood apart from the other five was the fact that in his photo on the right side of the rear of his head there appears to be a small hair braid could be seen.  The subject of the first photo (Gov. Ex. A at 1), is the only one to wear a piece of jewelry in his left ear lobe.

12.     The agents asked Hicks whether there was someone familiar to him among the photos and, if so, to point to that person.  Hicks selected the second photo (Id. at 2), the photo of defendant Darius Rose, as the person who held the AK-47 weapon.  No agent acted in any way to influence Hicks to select this photo.  Hicks wrote his own name and "9/30/15" on this photo sheet.  Two agents also signed this photograph.  (Id. )

---

[3] After receiving Government Exhibit A into evidence, the undersigned paginated it in the upper right hand corners of the pages.

**DISCUSSION**

Defendant Rose seeks the suppression of the identification of his photo by victim Ryan Hicks during the September 30, 2015 interview with the FBI agents. He argues that the procedure used to display the photographs was unduly suggestive and thereby violated the Due Process Clause of the Fifth Amendment. Identification evidence generally violates due process, if it results from a procedure that is unnecessarily suggestive and that may lead to an irreparably mistaken identification. Stovall v. Denno, 388 U.S. 293, 301-02 (1967). Such an identification, however, may be admissible if it is nonetheless reliable. Neil v. Biggers, 409 U.S. 188, 198 (1972). Reliability depends upon (1) the witness' opportunity to view the suspect at the time of the crime; (2) the witness' degree of attention at the time of the crime; (3) the accuracy of the witness' description of the suspect prior to the identification; (4) the witness' level of certainty at the time of the identification; and (5) the length of time between the crime and the identification. Manson v. Brathwaite, 432 U.S. 98, 114-16 (1977).

In this case, the procedure used to display the photographs to victim Hicks was not unnecessarily suggestive. There were six color photographs of the faces of African American men. Each photo was displayed similarly. All six subjects appeared to be approximately the same age and build. Each had some hair on the upper lip and chin. No one wore eyeglasses. The skin tones of ## 1, 2, 4, 5, and 6 (including defendant) were darker than subject 3 (not defendant). The only characteristic of #2 that stood apart from the other five was the fact that his photo displayed on the right side of the rear of his head what appears to be a small hair braid. The subject of the first photo (Gov. Ex. A at 1), is the only one to wear a piece of jewelry in his left ear lobe. Neither the hair braid on photo 2 (defendant) or the jewel in the ear lobe on photo 1 could have directed the attention of victim Hicks to defendant's photo, because whenever Hicks and P4 were together, P4 wore a ski mask. No evidence indicated that the right rear of his head or the left ear of P4 were observable in spite of the ski mask P4 wore.

The words used by the FBI agents when displaying the photos to Hicks in no way indicated that the photo of subject 2 was their suspect.  In fact, the agents indicated that the group of photos might not contain anyone involved in the kidnapping.

Even assuming the photo spread or the words used by the agents made the procedure unduly suggestive, which the undersigned does not find or conclude, the identification made by victim Hicks was reliable.  The first, second, and fifth <u>Manson</u> factors weigh heavily in favor of Hicks' identification being reliable.  Victim Hicks had a number of opportunities over six days, September 25 to 30, 2015, to view P4.  Hicks concentrated on P4, because P4 carried the AK-47 (and later a weapon with a silencer) and acted aggressively toward him.  Further, the nose and eye holes of P4's ski mask were sufficiently extra wide for Hicks to see some of the area around the eyes and nose.  There were several times when Hicks looked into the face of P4 from as close as an arm's length away.

None of the other <u>Manson</u> factors were evidenced during the hearing.  Nevertheless, the very substantial opportunities that victim Hicks had to view P4 with concentration, in spite of the ski mask, make his identification of the photo of defendant Rose reliable.

## **ORDER AND RECOMMENDATION**

For the reasons set forth above,

**IT IS HEREBY ORDERED** that the motion of the United States for a determination by the court of the admissibility of arguably suppressible evidence (Doc. 31 oral) is denied as moot.

**IT IS HEREBY RECOMMENDED** that the motions of defendant Darius Rose to suppress evidence and to suppress identification evidence (Docs. 30 oral, 50) both be denied.

The parties have 14 days to file written objections to this Order and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

       /S/   David D. Noce     
**UNITED STATES MAGISTRATE JUDGE**

Signed and filed on March 14, 2016.